Cite as 2023 Ark. 105

# SUPREME COURT OF ARKANSAS

**No.** CV-23-358

| | |
|---|---|
| | **Opinion Delivered:** June 15, 2023 |
| ARKANSAS DEPARTMENT OF EDUCATION; JACOB OLIVA, IN HIS OFFICIAL CAPACITY AS ARKANSAS SECRETARY OF EDUCATION; RANDY HENDERSON, JEFF WOOD, ADRIENNE WOODS, STEVE SUTTON, O. FITZGERALD HILL, OUIDA NEWTON, SARAH MOORE, KATHY MCFETRIDGE, AND LISA HUNTER, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE ARKANSAS STATE BOARD OF EDUCATION; FRIENDSHIP EDUCATION FOUNDATION; AND THE MARVELL-ELAINE SCHOOL DISTRICT <br><br> APPELLANTS | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FOURTH DIVISION [NO. 60CV-23-3267] <br><br> HONORABLE HERBERT WRIGHT, JUDGE |
| V. | |
| DORIS IVY JACKSON; LAVERNE SIMS; JESSELIA MAPLES; DIAMACIOUS SIMS; DARRYL HARRIS; SYLVIA MOORE; DANIELLE WRIGHT; DERASHAUN MCGHEE; VIVIAN DAVIS; JAMES CARRUTH; IOLA HOSKINS; STEVEN GRAPPE; VERONICA MCCLANE; AND CITIZENS FOR ARKANSAS PUBLIC EDUCATION AND STUDENTS (CAPES), A BALLOT QUESTION COMMITTEE <br><br> APPELLEES | REVERSED AND REMANDED; TEMPORARY RESTRAINING ORDER VACATED. |

**COURTNEY RAE HUDSON, Associate Justice**

Appellants, the Arkansas Department of Education ("the Department"); Jacob Oliva, in his official capacity as Arkansas Secretary of Education; Randy Henderson, Jeff Wood, Adrienne Woods, Steve Sutton, O. Fitzgerald Hill, Ouida Newton, Sarah Moore, Kathy McFetridge, and Lisa Hunter, in their official capacities as members of the Arkansas State Board of Education (collectively, "the State appellants"); the Friendship Education Foundation; and the Marvell–Elaine School District ("MESD") appeal from the Pulaski County Circuit Court's order granting a temporary restraining order ("TRO") in favor of appellees Doris Ivy Jackson, Laverne Sims, Jesselia Maples, Diamacious Sims, Darryl Harris, Sylvia Moore, Danielle Wright, DeraShaun McGhee, Vivian Davis, James Carruth, Iola Hoskins, Steven Grappe, Veronica McClane, and Citizens for Arkansas Public Education and Students ("CAPES"),[1] a ballot-question committee, in their lawsuit challenging the validity of the emergency clause in Act 237 of 2023 ("the LEARNS Act"). For reversal, appellants argue that the circuit court erred in granting appellees' motion for injunctive relief. We reverse the circuit court's order, vacate the TRO, and remand to the circuit court.

On February 23, 2023, the Arkansas Senate voted to pass the LEARNS Act, which was then Senate Bill 294. On March 2, 2023, the Arkansas House of Representatives voted to pass the LEARNS Act with an amendment. The Senate voted to concur in the House amendment to SB294 on March 7, 2023. The LEARNS Act was then sent to Governor Sarah Huckabee Sanders, who signed it into law on March 8. Section 73 of the LEARNS Act contained an emergency clause, which applied to specified parts of the omnibus act and caused certain provisions to become effective as of the date of the Governor's approval.

---

[1]CAPES, which filed its statement of organization on April 10, 2023, was formed to repeal the LEARNS Act through a citizen-initiated referendum petition.

During the 2020–2021 and 2021–2022 school years, the MESD was granted a waiver by the Arkansas State Board of Education ("Board") to avoid consolidation despite its enrollment of less than the state-designated minimum of 350 students. In November 2022, the Board voted to classify the MESD as in need of Level 5-Intensive support pursuant to Ark. Code Ann. § 6-15-2915 (Repl. 2021). The Board then denied the MESD's request for a minimum-school-size waiver in December 2022. On April 13, 2023, the Board voted to take over the MESD and directed Jacob Oliva, as the Secretary of Education, to act as the district's school board. The Board also voted to allow the MESD to remain open without consolidating and instructed Oliva to explore the option of entering into a transformation contract with a charter-school management company, as authorized under section 14 of the LEARNS Act. Following a meeting on May 5, 2023, the Board voted to direct Oliva to execute a contract with the Friendship Education Foundation to oversee management of the MESD.

On May 8, 2023, appellees, who are parents, grandparents, or employees of the MESD, residents of the Marvell area, and/or members of CAPES, filed a complaint against appellants seeking a declaratory judgment ruling that the LEARNS Act's emergency clause was invalid and ineffective. Appellees also filed a motion for a TRO or, alternatively, a motion for preliminary injunction. Appellees filed an amended complaint on May 16, 2023. Appellees claimed that appellants had committed ultra vires, illegal, and unconstitutional acts by entering into the transformation contract and expending funds under the LEARNS Act when it was not yet in effect. The complaint included claims under the Administrative Procedure Act, Ark. Code Ann. §§ 25-15-101 et seq. (Repl. 2014 & Supp. 2021), and the Uniform Declaratory Judgments Act, Ark. Code Ann. §§ 16-111-101 et seq. (Repl. 2016 & Supp. 2021), as well as for an illegal exaction under article 16, section 13 of the Arkansas Constitution. Appellees alleged three defects with the LEARNS Act's emergency clause. First, appellees asserted that

3

the General Assembly failed to vote by separate roll call on the emergency clause as required by article 5, section 1 of the Arkansas Constitution. Second, appellees claimed that section 73(a) of the LEARNS Act, which is the portion of the emergency clause that relates to the creation of transformation contracts, is invalid and ineffective because it fails to state facts sufficient to establish an emergency pursuant to article 5, section 1 of the Arkansas Constitution. Third, appellees alleged that the emergency clause is invalid and ineffective because it attempts to declare an emergency as to only some provisions in the Act rather than the Act as a whole.

Appellees also filed a first amended motion for TRO or, alternatively, for a preliminary injunction on May 16, 2023. The motion alleged that appellees would suffer irreparable harm if appellants continued to implement the LEARNS Act despite its invalid emergency clause because (1) the MESD would be obligated to make two $25,000 payments in May and June 2023 to the Friendship Education Foundation under the transformation contract, which would then diminish the funds available to the students; (2) the immediate execution of the transformation contract would deprive appellees and other residents of the district the opportunity to provide feedback regarding the contract; (3) based on statements by Oliva, the district is also at risk of being involuntarily consolidated, dissolved, or divided in retaliation for appellees bringing the lawsuit; and (4) CAPES and certain individual appellees are pursuing a citizen-initiated repeal of the LEARNS Act via a referendum petition, and the validity or invalidity of the emergency clause will impact their effort to gather signatures and determine whether the measure would be in effect pending a vote if a timely referendum petition is filed. Attached to the appellees' motion were affidavits by two of the plaintiffs, in addition to the transformation contract approved by the Board.

On May 25, 2023, appellees filed a second motion for a TRO or, alternatively, a preliminary injunction. This motion asserted that the MESD had recently issued letters to all

4

personnel under one-year contracts that their employment contracts were not being renewed for the 2023–2024 school year due to the transformation contract. Two appellees, Iola Hoskins and Danielle Wright, received this letter, and were informed that they could apply for a position at the resulting transformation campus. Appellees claimed that the loss of a majority of high-quality teachers and support staff constituted additional evidence of irreparable harm from the premature and illegal application of the LEARNS Act. In the absence of the Act, appellees argued that Arkansas law would have required compliance with certain notice and hearing provisions before employment contracts were not renewed.

The State appellants filed a response to appellees' motion for a TRO or preliminary injunction on May 26, 2023. They argued that appellees could not show a likelihood of success on the merits because the LEARNS Act and its emergency clause were passed by separate roll call as confirmed in the Senate and House Journals, which are the only official voting records. Appellants also claimed that the emergency clause contained sufficient supporting facts and that there was no requirement that the emergency clause apply to the entire Act. In addition, appellants claimed that appellees had not demonstrated irreparable harm because the suit would delay the implementation of the Act for only two months, at most. Appellants further argued that loss of employment and money damages do not qualify as irreparable harm and that the granting of injunctive relief would "sow chaos and impose irreparable harm on students, parents, teachers, the MESD, and the State." With regard to CAPES's claim of irreparable harm, appellants asserted that an injunction would have no effect on CAPES's efforts to collect signatures and file a proper referendum petition. The Friendship Education Foundation filed a response arguing that appellees were not entitled to injunctive relief for the reasons stated by the State appellants, and the MESD also filed a notice that it was adopting the State's response to appellees' motion.

5

On May 26, 2023, the circuit court entered an order granting appellees' motion for a temporary restraining order until a scheduled hearing on June 20, 2023. The court found that appellees had shown a likelihood of success on the merits of their complaint for the reasons argued in their motion. In addition, the court found that appellees had established that they would be irreparably harmed in the absence of an injunction based on the potential illegal exactions, the nonrenewal of the MESD's employee contracts and the impact on their ability to appeal the nonrenewal notices, the adverse effects related to the loss of employment on the school employees and the community, the denial of an opportunity for appellees to participate in shaping the transformation contract, and the denial of the CAPES appellees' right to use the referendum-petition process to delay or stop the LEARNS Act from going into effect. Appellants filed timely notices of appeal from the order.

On May 30, 2023, the State appellants filed an emergency motion to stay the circuit court's order pending their appeal. The MESD also requested expedited briefing on appeal. In an order entered on June 2, 2023, we granted the request for expedited briefing but denied appellants' request for a stay. We also granted a motion by Americans for Prosperity Foundation and yes.every.kid foundation to file an amicus curiae brief in support of appellants. Briefing is complete, and the case is now before us for decision.

On appeal, appellants argue that the circuit court erred in granting appellees' motion for a TRO. The State appellants specifically contend that appellees cannot demonstrate a likelihood of success because (1) this case presents a political question that this court may not decide, (2) sovereign immunity requires dismissal of the suit, and (3) the emergency clause is valid. The State appellants further argue that appellees have failed to establish irreparable harm and that the restraining order causes, rather than prevents, such harm. Finally, the State appellants contend that the TRO is facially invalid because it exceeds the time period permitted by Ark. R. Civ.

6

P. 65 and is too broad in scope. The MESD joins in the arguments made in the brief of the State appellants, while the Friendship Education Foundation has filed a separate brief primarily agreeing with the arguments made by the State appellants as to likelihood of success and irreparable harm.

We have held that an injunction is an extraordinary right reserved for extraordinary circumstances. *Muntiqim v. Hobbs*, 2017 Ark. 97, 514 S.W.3d 464. In determining whether to issue a temporary restraining order or a preliminary injunction pursuant to Ark. R. Civ. P. 65, the circuit court must consider two things: (1) whether irreparable harm will result in the absence of an injunction or restraining order and (2) whether the moving party has demonstrated a likelihood of success on the merits. *Thurston v. Safe Surgery Ark.*, 2021 Ark. 55, 619 S.W.3d 1; *Baptist Health v. Murphy*, 365 Ark. 115, 226 S.W.3d 800 (2006). This court will not reverse the circuit court's decision on whether to grant a preliminary injunction unless it is an abuse of discretion. *Bentonville Sch. Dist. v. Sitton*, 2022 Ark. 80, 643 S.W.3d 763. We will not delve into the merits of the case further than is necessary to determine whether the circuit court exceeded its discretion in granting the injunction. *Baptist Health*, *supra*.

We have stated that preventing irreparable harm is "the touchstone of injunctive relief." *Thurston v. Safe Surgery Ark.*, 2021 Ark. 55, at 19, 619 S.W.3d 1, 13. Thus, regardless of whether the moving party has established a likelihood of success, irreparable harm must be shown before the circuit court may grant injunctive relief. *Wilson v. Pulaski Ass'n of Classroom Teachers*, 330 Ark. 298, 954 S.W.2d 221 (1997). Because we agree with appellants that appellees have failed to demonstrate irreparable harm and reverse on this basis, any discussion of the parties' arguments regarding likelihood of success would be advisory. *See Our Community, Our Dollars v. Bullock*, 2014 Ark. 457, 452 S.W.3d 552 (stating that in light of our decision to reverse and remand on one point, any opinion on the remaining issues would be purely advisory). For the

7

same reason, we also do not address appellants' arguments regarding the facial validity of the TRO.

Appellees' allegations of irreparable harm can be summarized as follows: (1) potential illegal exactions from payments made by MESD to the Friendship Education Foundation pursuant to the transformation contract that would diminish the district's remaining funds; (2) the nonrenewal of the MESD's teacher and school-employee contracts, the impact on their ability to appeal the nonrenewal notices, and the adverse effects flowing from the loss of employment; (3) the risk of MESD being involuntarily consolidated, dissolved, or divided in retaliation for appellees' bringing the lawsuit; (4) the denial of an opportunity for appellees and other MESD residents to participate in and provide feedback on the transformation contract; and (5) the impairment of the CAPES appellees' right to pursue a citizen-initiated repeal of the LEARNS Act via a referendum petition.

We have repeatedly held that harm is normally considered irreparable only when it cannot be adequately compensated by money damages or redressed in a court of law. *E.g.*, *Bentonville Sch. Dist. v. Sitton*, *supra*; *Thurston v. Safe Surgery Ark.*, *supra*; *Manila Sch. Dist. No. 15 v. Wagner*, 356 Ark. 149, 148 S.W.3d 244 (2004). Appellees' claims regarding the expenditure of funds under the transformation contract are clearly monetary in nature and are therefore not considered irreparable. The alleged harm from the nonrenewal of the employment contracts and other adverse effects related to these nonrenewals can also be adequately compensated by money damages or redressed in a court of law. *See Wagner*, *supra* (holding that the loss of a job and possible relocation are present in virtually every employment-termination case and can be recouped in a court of law by a favorable judgment and an award of money damages). In addition, appellees' argument that MESD risks being consolidated, dissolved, or divided in retaliation for this lawsuit is entirely speculative and thus does not support a finding

8

of irreparable harm. *See AJ&K Operating Co. v. Smith*, 355 Ark. 510, 140 S.W.3d 475 (2004) (stating the fear about potential future action did not constitute irreparable harm). With regard to appellees' claim that they were deprived of an opportunity to provide feedback on the transformation contract due to its immediate execution, appellees have cited no authority that gives them this right. Furthermore, the Board's meeting wherein it approved the transformation contract was open to the public. Finally, the CAPES appellees' claim that their constitutional right of referendum would be impaired is also without merit, as their ability to collect signatures and otherwise pursue their referendum petition on the LEARNS Act is not affected by the absence of a restraining order. Accordingly, because appellees failed to meet their burden of proving irreparable harm, the circuit court abused its discretion in granting the motion for a TRO. We therefore reverse the circuit court's order, vacate the TRO, and remand to the circuit court.

Reversed and remanded; temporary restraining order vacated.

Mandate to issue immediately.

BAKER, WOOD, WOMACK, and WEBB, JJ., concur.

KEMP, C.J., and WYNNE, J., dissent.

**KAREN R. BAKER, Justice, concurring.** While I concur in the decision to reverse and remand, I write separately to address the claims that seek to control the actions of the State. Until *Board of Trustees of the University of Arkansas v. Andrews*, 2018 Ark. 12, 535 S.W.3d 616, is overruled, suit against the State is barred. As I explained in my dissent in *Arkansas Oil & Gas Commission v. Hurd*, 2018 Ark. 397, at 18–19, 564 S.W.3d 248, 258–59,

> In *Andrews*, the court held that "never means never," therefore . . . suit is barred based on the broad language in *Andrews* . . . because *Andrews* did not identify exceptions, exemptions or the like. Again, the State may never be sued.
>
> . . . .

*Andrews* held that the State may never be made a defendant in any of her own courts. Accordingly, despite the majority's attempt to narrow *Andrews*, . . . State conduct is at issue, and *Andrews* bars suit.

Therefore, any claims that seek to control the actions of the State are barred pursuant to *Andrews*.

With respect to any remaining claims that do not implicate sovereign immunity, I agree with the majority's holding that the appellees failed to demonstrate that irreparable harm will result in the absence of the TRO. Accordingly, I agree that the circuit court abused its discretion in granting the motion for TRO.

For the reasons stated in my discussion above, I concur with the result reached by the majority and would reverse and remand.

**RHONDA K. WOOD, Justice, concurring.** I join the majority opinion's reversal because I agree with its conclusion that appellees failed to establish irreparable harm. I write separately because the appellees fail the second prong of our analysis in that they are unlikely to succeed on the merits of each of their three claims. I would reverse the temporary restraining order for this reason as well.

First, appellees argue that the emergency clause is invalid because they allege there was not a separate roll-call vote. This issue involves deciding whether the official legislative journal conflicts with videos of the proceedings. The answer will depend on which is the official vote and record. But we cannot resolve this issue without exceeding our judicial role by answering a political question. The Arkansas Constitution gives each house authority to determine its own rules and procedures.[2] It specifically requires the houses to keep and publish journals of their

---

[2]Ark. Const. art. 5, § 12.

proceedings.[3] Answering a political question about whether video has replaced the constitutional journal entries and how the legislature conducts its vote proceedings would violate separation of powers. We cannot usurp the legislative branch's core functions or threaten its independent institutional integrity.[4] The only way to decide this issue would be to pass judgment on the legislative branch's internal procedural method of recording votes. This is not our role.

Like the eight other state courts that have considered challenges based on the legality of internal legislative processes, we should conclude that this issue presents a nonjusticiable political question.[5] For example, New Hampshire has declined to weigh in on a constitutional challenge to the validity of the method to enact a statute because "[t]he authority to adopt procedural rules for passing legislation is demonstrably committed to the legislative branch."[6] The Washington Supreme Court has declined to interfere with the internal proceedings of a legislative house on a point of order.[7] The Alabama Supreme Court held the legislature could rely on its own rules and procedures despite a constitutional challenge.[8] The Maryland Supreme

---

[3]*Id.*

[4]Ark. Const. art. 4; *see also Baker v. Carr*, 369 U.S. 186 (1962); *Ark. State Bd. of Elec. Comm'rs v. Pulaski Cty. Elec. Comm'n*, 2014 Ark. 236, 437 S.W.3d 80.

[5]*See, e.g., Sumner v. New Hampshire Sec'y of State*, 136 A.3d 101, 106 (N.H. 2016); *Brown v. Owen*, 165 Wash. 2d 706, 722 (2009); *Jefferson Cty. Comm'n v. Edwards*, 32 So. 3d 572, 584 (Ala. 2009); *Smigiel v. Franchot*, 978 A.2d 687, 701 (Md. 2009); *Brady v. Dean*, 790 A.2d 428, 433 (Vt. 2001); *Mayhew v. Wilder*, 46 S.W.3d 760, 773 (Tenn. Ct. App. 2001); *Philpot v. Haviland*, 880 S.W.2d 550, 552 (Ky. 1994); *Sweeney v. Tucker*, 375 A.2d 698, 705 (Pa. 1977).

[6]*New Hampshire Secretary of State*, 136 A.3d at 106.

[7]*Brown*, 165 Wash. 2d at 722.

[8]*Jefferson Cty. Comm'n*, 32 So. 3d at 584.

Court held that judicial intrusion into a legislative internal procedural issue would represent a "fail[ure] to respect a coordinate branch of government" and found the claim nonjusticiable.[9] The Vermont Supreme Court decided that a challenge to a law whose passage involved approval by legislators allegedly ineligible to vote on a bill was a nonjusticiable political question.[10] The Tennessee Court of Appeals refused to hear an issue that bills were allegedly products of prohibited, secret legislative meetings because the question of when to close sessions was a "purely political question."[11] Likewise, the Kentucky Supreme Court refused to step into legislative procedural matters; so too did the Pennsylvania Supreme Court when it held that "a challenge to the Legislature's exercise of power which the Constitution commits exclusively to the Legislature presents a nonjusticiable 'political question.'"[12] I thus find that Arkansas would decline to answer a political question that violates separation of powers, and so the appellees would be unlikely to succeed on the merits of this issue.[13]

---

[9]*Smigiel*, 978 A.2d at 701.

[10]*Brady*, 790 A.2d at 433.

[11]*Mayhew v. Wilder*, 46 S.W.3d at 773.

[12]*Philpot*, 880 S.W.2d at 552 (Ky. 1994); *Sweeney*, 375 A.2d at 705.

[13]Additionally, appellees' textualist argument relying on *Board of Trustees v. Andrews*, 2018 Ark. 12, was at their peril. From the onset of this case, plaintiffs argued *Andrews* to support their argument under article 5, section 1. This demonstrates a lack of understanding of *Andrews* and the avalanche of caselaw that ensued. Appellees argue *Andrews* for the proposition that this court will ignore precedent when a careful reading of *Andrews* will show that it vacated intervening caselaw and returned to prior precedent. But also, *Andrews* is substantively about the text of article 5, section 20 that the "state can never be made a defendant in her courts." Plaintiffs bringing declaratory judgment claims against the state and raising textualist arguments should use caution when citing *Andrews* for their support without recognizing and addressing the inherent contradiction that they are seeking to make the state a defendant.

Next, the appellees challenge the emergency clause because, they contend, it fails to state an emergency that is necessary for the "preservation of the public peace, health and safety." Ark. Const. art. 5, § 1. Our court has held that "if reasonable people might disagree about whether the enunciated fact states an emergency, the clause will be upheld."[14] The Act's emergency clause explained that educational services to children impacts the public peace, health, and safety of Arkansas. Of that, no one can disagree. The legislature explained that the Act's extensive reforms would require schools and the Department of Education to implement new rules, policies, and procedures before the 2023-2024 school year begins. Thus, the emergency clause provides specific facts explaining the emergency and how it impacts the "preservation of public peace, health and safety"—here, student learning.

The Act's emergency clause differs from the one in *Safe Surgery*, which stated an emergency existed for implementation of a new set of rules for the ballot-initiative or referendum process but didn't explain why the prior rules couldn't continue or how the rule changes impacted public peace, health, or safety.[15] We should give substantial deference to the legislature's determination of whether an emergency exists when it gives some explanation which was the original meaning behind the language in Amendment 7.[16] Applying that deference here, I conclude the appellees are unlikely to succeed on the claim that the emergency clause fails to sufficiently state an emergency.

---

[14]*Burroughs v. Ingram*, 319 Ark. 530, 533, 893 S.W.2d 319, 321 (1995) (looking to the original meaning for the adoption of Amendment 7, the court found that it was to prevent the practice of attaching an emergency clause to almost every law, but to require the General Assembly note facts constituting the emergency in the particular statute).

[15]*See Safe Surgery Ark. v. Thurston*, 2019 Ark. 403, 591 S.W.3d 293 (Wood, J., concurring).

[16]*Id*.; *see also Burroughs*, 319 Ark. at 530, 893 S.W.2d at 210.

Last, appellees argue that either all of an act or none of an act must be declared an emergency. Their interpretation of the constitution reads a requirement into the constitution that does not exist. Therefore, I also find its argument unlikely to succeed on the merits.

Accordingly, while I join the majority opinion, I would also reverse and vacate the circuit court's temporary restraining order because appellees are unlikely to succeed on the merits of each of their claims.

**SHAWN A. WOMACK, Justice, concurring.** I join the majority's analysis of the issue of irreparable harm. I write separately to address additional, relevant issues and to respond to the dissent. The majority opinion is correct: the appellees will not suffer any irreparable harm absent the temporary restraining order, and, therefore, the circuit court abused its discretion.[1] But in my opinion, the appellees have no chance of succeeding on the merits, which is the strongest argument in favor of reversal.

## I. *Sovereign Immunity*

First and foremost, sovereign immunity bars nearly the entirety of the appellees' lawsuit. Absent an express constitutional provision to the contrary, the State shall never be a defendant in any of its courts.[2] One of these express constitutional provisions, however, is the provision authorizing illegal-exaction lawsuits against the State.[3] Thus, except for the narrowly described illegal-exaction claim about specific payments from the State to the Marvell-Elaine School

---

[1] *Bentonville Sch. Dist. v. Sitton*, 2022 Ark. 80, at 7–8, 643 S.W.3d 763, 769.

[2] *Thurston v. League of Women Voters of Ark.*, 2022 Ark. 32, at 17, 639 S.W.3d 319, 327 (Womack, J. dissenting).

[3] Ark. Const., art. 16, § 13; *see also Rutledge v. Remmel*, 2022 Ark. 86, at 10, 643 S.W.3d 5, 11 (Womack, J., concurring).

District budget for the Friendship Education Foundation, sovereign immunity bars the appellees' claims against the State.[4]

## II. *Success on the Merits*

Sovereign immunity notwithstanding, the appellees still fail to show *any* likelihood of success on the merits. This court gives the "[l]anguage of a constitutional provision . . . its obvious and common meaning."[5] To enact an emergency clause, the constitution requires that "two-thirds of all the members elected to each house . . . shall vote upon separate roll call in favor."[6] The constitution separately dictates the process by requiring that a vote on the passage of a bill is conducted when "the vote be taken by yeas and nays; the names of the persons voting for and against the same be entered on the journal; and a majority of each house be recorded thereon as voting in its favor."[7] Thus, the journals of each chamber serve as the only official record of the General Assembly's votes.[8]

The appellees, however, would have this court ignore this clear constitutional command. Instead, they ask us to consider only the video recordings of each session, where the legislators either announce their votes or enter them via computer. But as explained, this is not what constitutes the official votes of legislators on a bill, and video recordings are not the official record of the General Assembly.[9] Absent a future amendment to the constitution, only the

---

[4]But because I would hold that the LEARNS Act was constitutionally enacted, the illegal–exaction claim fails.

[5]*Zook v. Martin*, 2018 Ark. 293, at 4, 557 S.W.3d 880, 883.

[6]Ark. Const. art. 5, § 1.

[7]*Id.* § 22.

[8]*Id.*; *see also Niven v. Rd. Improvement Dist. No. 14 of Jefferson Cnty.*, 132 Ark. 240, 242, 200 S.W. 997, 997 (1918) (recognizing that "the journal entry [is] the sole evidence of the proceedings").

[9]Ark. Const. art. 5, § 22.

official journal of each legislative body can prove or disprove the vote on a bill.[10] The journals of both the House of Representatives and the Senate show the LEARNS Act received two separate votes: one on the substance of the bill and one on the emergency clause. As a result, the process by which the General Assembly passed the LEARNS Act was undoubtedly constitutional, and it was effective upon the various effective dates contemplated therein.[11] Yet, inexplicably, the dissent, which cites the Senate Journal signed by the Secretary of the Senate, as well as affidavits by the Senate Chief Counsel and the House Parliamentarian, reaches the conclusion that no separate vote occurred.

It seems the dissent, the circuit court, and the appellees have all confused the issue of separate votes with simultaneous votes. Both the House and the Senate have established internal processes for voting on bills and their emergency clauses simultaneously, unless requested otherwise by a member.[12] They each then record those simultaneous but separate votes in their respective journals. Nothing in our constitution prohibits the House and Senate from conducting simultaneous votes and adopting their own internal processes. To the contrary, the constitution explicitly provides that "[e]ach house shall have the power to determine the rules of its proceedings[,] . . . [and] [e]ach house shall keep a journal of its proceedings."[13] Any attempt by the circuit court or this court to dictate the internal procedures of the House and

---

[10]*Id.*

[11]*Id.* §§ 1 & 22.

[12] Affidavits of House Parliamentarian, Finos B. Jonson, and Senate Chief Counsel, Phillip Treat.

[13]Ark. Const. art 5, § 12.

Senate would constitute an unconstitutional judicial encroachment on the legislative branch and violate the principle of separation of powers.[14]

### III. *Political Question*

Separate from the issues regarding the process of adopting the emergency clause is an argument regarding its substance and content. The circuit court determined that the General Assembly's findings to support the emergency clause were insufficient. Such a determination, however, is beyond the judicial branch's competency.[15] The constitution provides "that a measure shall become effective without delay" "[i]f it shall be necessary for the preservation of the public peace, health and safety[.]"[16] When is a measure necessary for the preservation of the public peace, health, and safety? That is a question of policy solely for the General Assembly to decide—not this court or any other court.[17]

Wresting power from the General Assembly to determine what constitutes an emergency is not only unconstitutional,[18] but also, it is essentially saying that courts alone possess the capacity of reasonable interpretation—not the 78 duly elected men and women of the Arkansas House of Representative who voted for the bill, not the 25 duly elected men and women of the Arkansas Senate who voted for the bill.[19]

---

[14]Ark. Const. art. 4, § 2.

[15]*Safe Surgery Ark. v. Thurston*, 2019 Ark. 403, at 10–11, 591 S.W.3d 293, 299 (Womack, J., dissenting).

[16]Ark. Const. art. 5, § 1.

[17]*Safe Surgery Ark.*, 2019 Ark. 403, at 10–11, 591 S.W.3d at 299 (Womack, J., dissenting).

[18]Ark. Const. art. 4, § 2.

[19]*Safe Surgery Ark.*, 2019 Ark. 403, at 11, 591 S.W.3d at 299 (Womack, J., dissenting).

A supermajority of the General Assembly determined

> that the provision of educational services to children in the State of Arkansas impacts the public peace, health, and safety through its effect upon student learning, which is critical for the future success of the state; that the act amends substantial portions of the Arkansas Code as it pertains to prekindergarten through grade twelve (preK-12) education in the State of Arkansas; that these amendments are extensive and will require new rules and procedures to be developed to implement the changes; that many of the changes to the Arkansas Code will require that certain procedures are put in place before the beginning of the 2023-2024 school year; that this act is immediately necessary in order to give local public school districts time to update school district policies to account for changes created by this act to provide necessary educational services; and that this act is immediately necessary in order to give the Department of Education time to promulgate rules necessary to implement this act to provide necessary educational services. Therefore, an emergency is declared to exist[.][19]

And a finding is all the constitution requires the General Assembly to make.[20] The power to determine whether a measure is necessary for the preservation of the public peace, health, and safety—and, therefore, must be effective without delay—lies wholly with the General Assembly.[21]

## IV. *Varying Effective Dates*

The appellees argue that varying effective dates within the Act render it invalid. Specifically, they contend that an emergency clause cannot attach to some subsections of the bill and not others, i.e., it must apply to the entire Act or no part at all. Yet the appellees cite nothing to support this proposition, and the circuit court merely adopted their baseless assertions in its order. When considering the applicability of an emergency clause, the constitution only contemplates its effect on a "measure[,]" which is defined as "any bill, law, resolution, ordinance, charter, constitutional amendment or *legislative proposal or enactment of any character.*"[22]

---

[20]Ark. Const. art. 5, § 1.

[21]*Id.*

[22]Ark. Const. art. 5, § 1 (emphasis added).

The final phrase is broad enough to vest the General Assembly with the discretion to include varying effective dates.[23] Typically, courts will (and should) defer to legislatures about their internal procedures and rules.[24] For example, the Supreme Court of Alabama has rightly recognized that the legislature defines the terms and scope of its internal procedure, so long as they do not conflict with the state constitution.[25] Similarly, the Supreme Court of the United States has properly deferred to Congress when that Court confronts a challenge to certain congressional procedures.[26] In *Nixon v. United States*, an impeached federal judge argued that the U.S. Constitution's impeachment clause required the proceedings to be "in the nature of a judicial trial."[27] Rejecting this argument, the Supreme Court held that because the U.S. Constitution vested the impeachment power solely in Congress, and the Senate's procedures were not obviously foreclosed, it was the Senate's prerogative to "determine the meaning of the word 'try' in the Impeachment Trial Clause."[28] These principles apply here.

Article 5, section 1 of the Arkansas Constitution does not prohibit the General Assembly from attaching varying effective dates to subsections of a single act. Just as the General Assembly cannot control which portions of an opinion the justices of this court join, this court cannot control which effective dates the General Assembly chooses for portions of its enactments. So long as the General Assembly follows the procedures set forth in article 5 of the Arkansas

---

[23]*See id.*

[24]*See, e.g.*, *Birmingham-Jefferson Civic Ctr. Auth. v. City of Birmingham*, 912 So. 2d 204, 217 (Ala. 2005).

[25]*Id.* at 218.

[26]*Nixon v. United States*, 506 U.S. 224, 226 (1993).

[27]*Id.* at 229.

[28]*Id.* at 230–31, 237.

Constitution, it is within the General Assembly's discretion to choose the means by which to employ them.

## V.  *Attorney Behavior*

Next, I would caution the primary attorneys in this case regarding their tone and tenor and would remind them that the way they litigate a case, both publicly and before this court, should reflect the professionalism that is expected of licensed attorneys.  Specifically, it was wholly inappropriate for the appellees' attorney to engage in partisan rancor by including in her brief to this court a tweet from a highly partisan blog discussing members of this court in relation to the case pending before us.

## VI.  *Conclusion*

There is simply no irreparable harm to the appellees from the LEARNS Act,[29] and there is *no* likelihood of success on the merits for the appellees' claim that the LEARNS Act's

---

[29]In fact, the irreparable harm undoubtedly falls on the appellants and the people of Arkansas. I would note just a few examples of the real-world consequences if the dissenters had prevailed:

a. Sex offenders would no longer be required to register using their physical addresses, Act 37 of 2023;

b. Rural hospitals would lose their licenses, Act 59 of 2023;

c. Fentanyl traffickers would have reduced consequences for their action, The Fentanyl Enforcement and Accountability Act of 2023, Act 584 of 2023;

d. Homeless shelters would be unable to save those they serve who are overdosing on opioids, Act 586 of 2023;

e. A foster parent would lose her right to take maternity leave, Act 770 of 2023;

f. Law enforcement agencies across the state would lose immediate access to grants aimed at combatting violent crime, Act 775 of 2023; and

g. A terminally ill high school student who received his high school diploma this spring and was at risk of dying before his graduation would have his diploma posthumously revoked, Act 662 of 2023.

These are only a few of the hundreds of acts that the appellees and dissenters would have invalidated had we not reversed the circuit court's erroneous order.  Not included here, but just as relevant, are many appropriation bills that authorize the expenditures for the operations of state government beginning July 1, 2023.

emergency clause was unconstitutionally passed. Therefore, I would reverse and vacate the temporary restraining order.

I respectfully concur.

WEBB, J., joins.

**BARBARA W. WEBB, Justice, concurring.** With the exception of Section I, I fully join Justice Womack's concurring opinion.

**JOHN DAN KEMP, Chief Justice, dissenting.** For the reasons set forth below, I would hold that the circuit court did not abuse its discretion in granting appellees' motion for temporary restraining order (TRO).[1] I must respectfully dissent.

## I. *TRO*

Rule 65 of the Arkansas Rules of Civil Procedure governs the issuance of TROs. In determining whether to issue a TRO pursuant to Rule 65, a circuit court must consider two issues: (1) whether irreparable harm will result in the absence of an injunction or restraining order and (2) whether the moving party has demonstrated a likelihood of success on the merits. *Bentonville Sch. Dist. v. Sitton*, 2022 Ark. 80, at 7–8, 643 S.W.3d 763, 769.

The issuance of a TRO is a matter addressed to the sound discretion of the circuit court. *Id.* at 8, 643 S.W.3d at 769. This court will not reverse the circuit court's ruling unless there has been an abuse of discretion. *Id.*, 643 S.W.3d at 769. An abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the

---

[1]On appeal to this court, the parties briefed the issues of a nonjusticiable political question and sovereign immunity. But the circuit court did not rule on these issues, and in my view, they are not preserved for appellate review. *See Rutledge v. Remmel*, 2022 Ark. 86, at 4, 643 S.W.3d 5, 8 (stating that this court addresses only ruled–upon challenges, and "[a]ll other issues fall outside the scope of [this court's] review at this stage in the litigation"); *Harris v. Hutchinson*, 2020 Ark. 3, at 4, 591 S.W.3d 778, 781 (stating that "sovereign immunity . . . must be raised and ruled on at the circuit court level in order to preserve the issue").

circuit court act improvidently, thoughtlessly, or without due consideration. *Dollar Gen. Corp. v. Elder*, 2020 Ark. 208, at 12, 600 S.W.3d 597, 605. In reviewing the circuit court's findings, we give due deference to the circuit court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Ark. Dep't of Hum. Servs. v. Ledgerwood*, 2017 Ark. 308, at 8, 530 S.W.3d 336, 342.

## A. Validity of the TRO

Rule 65(b) of the Arkansas Rules of Civil Procedure provides:

> (2) Contents; Expiration. Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record. The order expires at the time after entry--not to exceed 14 days--that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record.

Here, the circuit court ruled:

> A temporary restraining order, effective only until the court can hear this matter on June 20, 2023, and render its decision on Plaintiffs' pending motions, is necessary to prevent the Defendants from continuing to violate the Arkansas Constitution, the Administrative Procedure Act, and the substantive rights of the plaintiffs. . . . This order shall expire on June 20, 2023, following the hearing scheduled on Plaintiffs' pending motions, not to exceed fourteen days from the date of its issuance, unless terminated or extended by the Court.

I interpret the circuit court's order to mean there is good cause to extend its TRO beyond the fourteen-day period to the June 20 hearing. For this reason, I would hold that the TRO is valid, and I would reach the merits of the arguments concerning the TRO.

## B. Likelihood of Success on the Merits

The first issue is whether appellees, as the moving parties, have demonstrated a likelihood of success on the merits regarding the validity of the emergency clause. This court has held that to justify a grant of TRO relief, a plaintiff must establish that it will likely prevail on the merits

at trial. *Sitton*, 2022 Ark. 80, at 9, 643 S.W.3d at 770. The test for determining the likelihood of success is whether there is a reasonable probability of success in the litigation. *Id.* at 9, 643 S.W.3d at 770. This court will not delve into the merits of the case further than is necessary to determine whether the circuit court exceeded its discretion in granting the injunction. *Id.* at 9, 643 S.W.3d at 770.

Appellees' complaint and amended complaint sought declaratory and injunctive relief, pursuant to Arkansas Code Annotated sections 16-111-101 et seq. (Repl. 2016 & Supp. 2021). The gravamen of appellees' amended complaint and underlying action seeking declaratory judgment is that the emergency clause, section 73 of Act 237 of 2023, the Arkansas LEARNS Act, is invalid and inoperable. In their amended complaint, appellees alleged, inter alia, that the emergency clause is invalid because "Section 73 of Act 237, entitled 'Emergency Clause,' was not passed by a separate roll-call vote garnering a two-thirds majority, as required by Article 5, Section 1 of the Constitution of the State of Arkansas."

In support of this claim, appellees relied on article 5, section 1 of the Arkansas Constitution, which provides in relevant part:

> Emergency. If it shall be necessary for the preservation of the public peace, health and safety that a measure shall become effective without delay, such necessity shall be stated in one section, and if upon a yea and nay vote two-thirds of all the members elected to each house, or two-thirds of all the members elected to city or town councils, shall vote upon separate roll call in favor of the measure going into immediate operation, such emergency measure shall become effective without delay. It shall be necessary, however, to state the fact which constitutes such emergency. Provided, however, that an emergency shall not be declared on any franchise or special privilege or act creating any vested right or interest or alienating any property of the State. If a referendum is filed against any emergency measure such measure shall be a law until it is voted upon by the people, and if it is then rejected by a majority of the electors voting thereon, it shall be thereby repealed. The provision of this sub-section shall apply to city or town councils.

23

Appellees made this claim in their original motion for TRO, and they included and adopted it in both their first and second amended motions for TRO.

On this issue, the circuit court specifically ruled:

> All of these claims hinge on the Plaintiff[s'] contention that the emergency clause in the Arkansas LEARNS Act, Act 237 of 2023, is invalid. The Court finds and concludes that . . . . Section 73 of Act 237, entitled "Emergency Clause," was not passed by a separate roll-call vote garnering a two-thirds majority, as is required by Article 5, Section 1 of the Constitution of the State of Arkansas. The Arkansas Supreme Court held in *Board of Trustees of the University of Arkansas v. Andrews*, 2018 Ark. 12 (2018), that the General Assembly cannot waive by law the State's sovereign immunity granted in Arkansas Constitution, Article 5, Section 20. In doing so, the court overturned years of precedent and rejected the General Assembly's claim that it could create policy that conflicts with the provisions of the Arkansas Constitution. Worries about upsetting the apple cart by upending precedent were not enough to override the Arkansas Supreme Court's commitment to enforcing the plain language of Article 5. In fact, the court specifically noted that the language should be interpreted "precisely as it reads." *Id*. Similarly, in *Buonauito v. Gibson*, 2020 Ark. 352, the Arkansas Supreme Court held that the phrase "four-lane highway" in Amendment 91 could not be interpreted to mean a six-lane highway because the Constitution's language was plain and unambiguous.
>
> So too here. The word "separate" cannot mean "the same." In order to pass a valid and enforceable emergency clause, the Arkansas General Assembly was required by Article 5, Section 1 to hold a separate roll-call vote, and they failed to do so.

In making its ruling at this stage in the litigation, the circuit court considered the numerous exhibits in the record. Among those exhibits were the following:

(1) Exhibit 9—Draft Senate Journal indicating a separate vote on Senate Bill 294 (26 yeas, 8 nays, and 34 total votes) and its emergency clause (26 yeas, 8 nays, and 34 total votes), signed by Ann Cornwell, Secretary of Senate;

(2) Exhibit 11—the affidavit of Finos B. Johnson, Jr., the Arkansas House of Representatives Parliamentarian, who swore that "[a] single Representative may make a motion that the electronic roll-call votes for the bill and for the emergency clause be taken separately[,]" but that "[n]o such motion occurred during the vote on SB294[;]"

(3) Exhibit 12—the affidavit of Phillip Treat, Arkansas Senate Chief Counsel, who swore that "[t]he Arkansas Senate decides its own internal rules and parliamentary procedure," and that "[a]s a matter of internal procedure, Senators

24

have decided to convey *their separate roll call votes on emergency clauses in the same utterance as their votes on the underlying bill*."

(Emphasis added.)

Based on our standard of review, I agree with the circuit court's finding on this point. Without delving into the underlying merits of appellees' ongoing claims, it appears that they have demonstrated a likelihood of success on the merits that, by failing to conduct a separate roll-call vote on the emergency clause, the General Assembly did not substantially comply with the requirements set forth in article 5, section 1 of the Arkansas Constitution. Thus, I would hold that the circuit court did not abuse its discretion in its ruling on appellees' likelihood of success on the merits.

## B. Irreparable Harm

The second issue is whether irreparable harm will result in the absence of the TRO. Irreparable harm is the touchstone of injunctive relief. *Sitton*, 2022 Ark. 80, at 13, 643 S.W.3d at 772. This court has held that essential to the issuance of a temporary restraining order is a finding that a failure to issue it will result in irreparable harm to the applicant. *Ledgerwood*, 2017 Ark. 308, at 9, 530 S.W.3d at 343. The prospect of irreparable harm or lack of an otherwise adequate remedy is the foundation of the power to issue injunctive relief. *Id.*, 530 S.W.3d at 343. Harm is normally considered irreparable only when it cannot be adequately compensated by money damages or redressed in a court of law. *Id.*, 530 S.W.3d at 343.

The circuit court ruled that "the Plaintiffs have submitted affidavits supporting their assertion that, but for the issuance of a temporary restraining order, the Plaintiffs and many other members of the Marvell-Elaine School District community will suffer immediate, substantial, irreparable harm." Among those affidavits was one from Jesselia Maples, a plaintiff in the lawsuit and mother of four children who attend public schools in the Marvell-Elaine School District,

25

who swore that "[p]reventing the premature application of [the] Arkansas LEARNS Act will spare my family immediate irreparable harm. . . . [It] would cause harm to my children's education by reducing the resources available to educate them and placing control of our district in a charter-management company that does not have a strong academic track record."

This affidavit and appellees' request for declaratory judgment in their amended complaint,[2] which was based, in part, on "Plaintiffs' right to . . . educate their children[,]" demonstrate that this plaintiff presently seeks to protect her children's "right to equal educational opportunity [that] is basic to our society." *DuPree v. Alma Sch. Dist. No. 30 of Crawford Cnty.*, 279 Ark. 340, 346, 651 S.W.2d 90, 93 (1983). A violation of a constitutional right is deemed irreparable harm for purposes of injunctive relief. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Moreover, this appeal hinges on this court's well-established standard of review: whether the circuit court abused its discretion. Giving due deference to the circuit court, I would hold that the circuit court did not act improvidently, thoughtlessly, or without due consideration in its ruling. *See Dollar Gen. Corp.*, 2020 Ark. 208, at 12, 600 S.W.3d at 605. Therefore, without delving into the merits of appellees' ongoing claims, I conclude that the circuit court did not abuse its discretion in ruling that, absent a TRO, appellees would suffer irreparable harm at this stage in the litigation.

## II. *Conclusion*

I would hold that the circuit court did not abuse its discretion in granting appellees' motion for TRO. Accordingly, I would affirm.

WYNNE, J., joins.

---

[2]Appellees' amended complaint was incorporated by reference in their first and second amended motions for TRO.

26

*Tim Griffin*, Att'y Gen., by: *Nicholas J. Bronni*, Solicitor Gen.; *Dylan L. Jacobs*, Dep. Solicitor Gen.; and *Hannah L. Templin* and *Michael A. Cantrell*, Ass't Solicitors Gen., for State appellants.

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *Devin R. Bates*, for appellant Friendship Education Foundation.

*Bequette, Billingsley & Kees, P.A.*, by: *W. Cody Kees*, for appellant Marvell–Elaine School District.

*Noland Law Firm, PA*, by: *Ali Noland*, for appellees.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, counsel for amici curiae yes. every kid. foundation and Americans for Prosperity Foundation – Arkansas in support of appellants' motion for stay.